UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KENDALL FAULKNER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MASTEC SERVICES COMPANY, INC., | ) |
| | ) |
| Defendant. | ) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Kendall Faulkner ("Faulkner"), brings this action against Defendant, Mastec Services Company, Inc. ("Defendant"), for unlawfully violating his rights as protected by Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, and 42 U.S.C. § 1981.

**PARTIES**

1. Faulkner has resided in Louisville, Kentucky for all relevant times. He was employed by Defendant to work on projects in and around the Southern District of Indiana.

2. Defendant operates and conducts business within the Southern District of Indiana. Defendant maintains an office and equipment facility in Indianapolis, Indiana.

**JURISDICTION AND VENUE**

3. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331; 42 U.S.C. § 1988; 42 U.S.C. § 2000e-5(f)(3); and 42 U.S.C. § 1981.

4. Faulkner was an "employee" within the meaning of 42 U.S.C. § 2000e(f).

5. Defendant is an "employer" within the meaning of 42 U.S.C. § 2000e(b);

6. Faulkner satisfied his obligations to exhaust his administrative remedies by first timely filing his Charge of Discrimination with the Equal Employment Opportunity Commission

("EEOC") on or about March 22, 2022.  The EEOC issued its "Notice of Right to Sue *(Issued on Request)*" on or about October 12, 2022.  Faulkner now files this lawsuit within 90 days after having received his right-to-sue.

## FACTUAL ALLEGATIONS

7. Faulkner is a former employee of Defendant, where he was a construction project manager.

8. Faulkner is, and always has been, an African–American.

9. Faulkner's work performance met or exceeded Defendant's legitimate performance expectations.

10. Faulkner's role at Defendant included working on an AT&T fiber project in and around Indianapolis, Indiana, as a construction project manager. In so doing, Faulkner was required to work closely with team members at AT&T and routinely had phone calls / meetings with those individuals. Of note, AT&T's business was highly valuable to Defendant and represented a large portion of its income.

11. At the time Faulkner was hired, Defendant knew that he resided in Louisville, Kentucky. Defendant further knew that Faulkner's position would allow him to work from home most of the time and travel when needed. In fact, Faulkner was told that he would have up to 25% travel. From the time he began his employment with Defendant, until he was terminated, Faulkner worked primarily from his residence in Kentucky. This was true when he was assigned to a project in Nashville, Tennessee, and when he was assigned to his final project in Indianapolis, Indiana.

12. On or about January 26, 2022, Faulkner was on a telephone call / meeting with: 1) Robert McKinney ("McKinney") (AT&T); 2) Steve Adamson ("Adamson") (AT&T); Vincent

Beckholt ("Beckholt") (AT&T); Stephen Robinson (Mastec); and John Horn ("Horn") (Mastec). The meeting ended and both Faulkner and Horn left the call. Right then the AT&T attendees asked an additional question, which Stephen Robinson heard so he stayed on the line. While listening to the AT&T attendees, Stephen Robinson heard Adamson refer to Faulkner as a clown. Stephen Robinson got off of the call and texted Faulkner what had happened.

13. Faulkner reasonably believed that the comment that he was a clown made by Adamson was racially motivated. As such, he called the AT&T attendees and addressed the issue with Beckholt and, subsequently, McKinney. Faulkner indicated that he reasonably believed that the comment was racial in nature. At the time of the calls, both Beckholt and McKinney stated that Stephen Robinson was lying about the clown comment. Almost immediately after the calls were ended, Faulkner received another call from McKinney and Beckholt saying that the comment was made by Adamson but that it was meant to address Defendant as a whole and not Faulkner.

14. During this time Faulkner was attending training in Indianapolis, Indiana, along with his supervisor Angela Bickell ("Bickell"). Faulkner pulled Bickell aside and explained to her what had happened and that he reasonably believed that the comment was racially motivated. Bickell acknowledged Faulkner's race based complaint and indicated a willingness to address the situation. A few minutes later, Bickell informed Faulkner that she had spoken with Mastec's director of construction, Jason Wall ("Wall), who indicated that AT&T would find out what happened.

15. Faulkner's reporting of race-based discrimination to both his supervisor and Defendant's director of construction is statutorily protected conduct under Title VII and § 1981.

16. Less than an hour after reporting discrimination, Bickell informed Faulkner that

he would have to start reporting to the Indianapolis office every work day. Faulkner had never been required to work from Defendant's office. Driving to Indianapolis from Louisville each day was a material deviation of his working conditions.

17. Faulkner asked how to handle the driving and the impact it would have on his personal vehicle. Wall stated that he could take a work truck from the Defendant's yard. All of the available work trucks in the Defendant's yard were ¾ ton (F250, Dodge 2500, or GM 2500) or larger vehicles. These vehicles are meant to haul large loads or pull large trailers, not commute back and forth approximately two and half hours each way.

18. Faulkner brokered an agreement with Stephen Robinson to drive a F150 pickup truck that Defendant had assigned to Stephen Robinson. Faulkner cleared this with Defendant, and a Defendant employee was to bring the truck to Faulkner. On the day the truck was to be brought to Louisville, Faulkner received a series of texts: 1) the employee was getting the truck; 2) the employee was heading to Louisville; and 3) several hours later, the employee was not bringing the truck. Evidently, Bickell intercepted the truck transport and had the F150 taken to one of Defendant's equipment yards in Elkhart, Indiana.

19. Thereafter, Bickell assigned a different F150 to Faulkner. Unlike the one that Robinson had offered to him, this F150 was in disrepair, covered in animal excrement, and, most likely, would not pass any state vehicle inspection, let alone a Department of Transportation inspection. Upon seeing the condition of this truck, and worrying about his safety in making a daily 4-5 hour round trip in it, Faulkner rejected it. This occurred Saturday, January 29, 2022.

20. The following day, Sunday, January 30, 2022, Faulkner rethought the truck issue and determined that if, the junk F150 was assigned to him, then he better have control over it in case something happened to the truck. As such, he drove to Defendant's Indianapolis office,

where he was based out of, obtained the keys of the truck assigned to him, and drove it back to Louisville.

21. On Tuesday, February 1, 2022, Faulkner received a call from Defendant's human resources personnel. The call quickly turned to Faulkner being aggressively accused of stealing the truck. These accusations were absolutely unfounded as he was assigned the vehicle and was given access to the vehicle by Defendant. Faulkner hid nothing from the Defendant's human resources personnel and told them exactly where the vehicle was, his driveway.

22. After this call ended, Faulkner received a call from another human resources individual and Wall. During this call he was once again accused of stealing the truck and that he was rude to Bickell. Faulkner was then terminated from his employment with Defendant.

23. Later that day, an employee of Defendant arrived at Faulkner's home along with a Louisville Police Department officer to retrieve the vehicle.

24. Other, similarly situated project managers have worked solely from home, save for necessary travel. By way of example, and not limitation, Ryan Devries (Caucasian) lives in North Carolina and supports Defendant's projects in and around Nashville, Tennessee. Upon information and belief, Devries has not complained about race discrimination, and Defendant has not forced Devries to drive to Nashville each business day.

25. Defendant took adverse employment actions against Faulkner due to his race and/or statutorily protected activity, both in violation of Title VII and 42 U.S.C. § 1981.

26. Defendant has accorded more favorable treatment to at least one similarly situated employee, who is not African-American and/or has not engaged in statutorily protected conduct.

27. Any reason provided by Defendant for the adverse actions it has taken against Faulkner are mere pretext for discrimination and/or retaliation.

28. Defendant's actions have violated Faulkner's rights as protected by Title VII as well as 42 U.S.C. § 1981.

29. Faulkner has been and continues to be harmed by Defendant's actions and/or inactions.

## COUNT I

## RACE DISCRIMINATION – TITLE VII

30. Faulkner hereby incorporates paragraphs 1-29 of his Complaint as if fully incorporated herein.

31. Defendant fired Faulkner because of his race.

32. Defendant's unlawful actions were intentional, willful, and done in reckless disregard of Faulkner's rights as protected by Title VII.

## COUNT II

## RACE DISCRIMINATION – 42 U.S.C. § 1981

33. Faulkner hereby incorporates paragraphs 1-32 of his Complaint as if fully incorporated herein.

34. Defendant fired Faulkner because of his race.

35. Defendant's unlawful actions were intentional, willful, and done in reckless disregard of Faulkner' rights as protected by 42 U.S.C. § 1981.

## COUNT III

## RETALIATION – TITLE VII and 42 U.S.C. § 1981

36. Faulkner hereby incorporates paragraphs 1-35 of his Complaint.

37. Faulkner engaged in statutorily-protected conduct.

38. Defendant fired Faulkner because of his statutorily-protected conduct.

39. Defendant's unlawful actions were intentional, willful, and done in reckless disregard of Faulkner' rights as protected by Title VII and 42 U.S.C. § 1981.

## REQUESTED RELIEF

WHEREFORE, Plaintiff, Kendall Faulkner, by counsel, respectfully requests that this Court find for him and order that:

1. Defendant pay lost wages and benefits to Faulkner;

2. Defendant reinstate Faulkner to the same position, with the requisite pay, seniority, and benefits, or pay front pay and benefits to him in lieu of reinstatement;

3. Defendant pay compensatory and punitive damages to Faulkner;

4. Defendant pay pre- and post-judgment interest to Faulkner;

5. Defendant pay Faulkner's attorneys' fees and costs incurred in litigating this action; and

6. Defendant pay to Faulkner any and all other legal and/or equitable damages that this Court determines appropriate and just to grant.

Respectfully submitted,

/s/ Bradley L. Wilson
Bradley L. Wilson, Attorney No. 21154-49

/s/ Shannon L. Melton
Shannon L. Melton, Attorney No. 29380-49

Attorneys for Plaintiff
Kendall Faulkner

WILSON MELTON, LLC
5226 South East Street, Suite A-5
Indianapolis, Indiana 46227
Telephone:   (317) 802-7181
 Email:        bwilson@wilsonmelton.com
                     smelton@wilsonmelton.com

## **DEMAND FOR JURY TRIAL**

Plaintiff, Kendall Faulkner, by counsel, respectfully requests a jury trial for all issues deemed triable.

Respectfully submitted,

/s/ Shannon L. Melton
Shannon L. Melton, Attorney No. 29380-49

Attorneys for Plaintiff
Kendall Faulkner